**UNITED STATES of America**

**v.**

**Harvey ALTER, Defendant.**

**No. 90 Cr. 397 (KC).**

United States District Court,
S.D. New York.

March 31, 1992.

Paul A. Engelmayer and Peter Vigeland, Asst. U.S. Attys., New York City, for U.S.

Lawrence Goldman and Alexander M. Eisemann, Goldman & Hafetz, New York City, for Harvey Alter.

## OPINION AND ORDER

CONBOY, District Judge:

The Court has before it a sentencing determination with respect to defendant Harvey Alter. From 1987 to early 1989, Alter directed Manhattan House, a now defunct halfway house under federal contract and located in the heart of New York City [1]. In June, 1990, Alter was indicted on twenty criminal counts, including several counts of sexual abuse of federal prisoners who had been transferred to Manhattan House [2]. In March 1991, Alter pled guilty to receiving a bribe [3] in the form of sexual

---

1. A halfway house is primarily a rehabilitative facility in which former prisoners or institutional residents are helped to adjust to the outside world. Halfway houses also offer courts a sentencing option other than prison. Many of the residents of Manhattan House were transferred from federal prisons four to six months prior to the termination of their sentences.

2. The indictment is dated June 20, 1990. Alter was charged with five counts of bribery in violation of 18 U.S.C. § 201(b)(2); five counts of sexual abuse by use of fear in violation of 18 U.S.C. § 2242(1); five counts of sexual abuse of persons in his lawful custody, in violation of 18 U.S.C. § 2243(b); one count of inducement of sexual contact in violation of 18 U.S.C.

§ 2244(a)(2); and four counts of making a false statement, in violation of 18 U.S.C. § 1001.

3. The date of the written plea agreement is March 12, 1991. On March 21, Alter pled guilty under 18 U.S.C. § 201(b)(2) to one count of bribery. Alter's entire plea consisted of the following statement:

> [W]hile I was at the halfway house, I agreed with a resident named Donald V. that I would approve a pass for him to go to a non-existent location, in return for which he would go with me [to] Fire Island and would engage in sexual acts. While we were at Fire Island, we did in fact engage in sexual acts. Transcript Dated March 21, 1991 at 18.

favors from one of the halfway house residents, Donald V., in exchange for Alter's approval of a pass to leave the halfway house [4].

The principal questions before the Court under the Federal Sentencing Guidelines are 1) did Alter's conduct toward Donald V. constitute a form of extortion rather than receipt of a conventional bribe, and 2) does Alter's conduct necessitate an upward departure?

The pre-sentence report states that Alter's conduct did not involve a threat of physical harm or property destruction, and that therefore Alter did not extort favors from Donald V. within the meaning of Guidelines § 2C1.1(c)(3). The report, however, concludes that an upward departure is necessary because Alter's conduct both caused Manhattan House to close and harmed the reputation of the United States Bureau of Prisons.

In substance, the Government contends that Alter's conduct involved a threat of physical harm because it entailed the prospect of such harm, *i.e.*, sadistic torture that was part of the sex that Alter had with Donald V. The Government further seeks various sentencing enhancements and upward departures based, in sum, on Donald V.'s vulnerability, Alter's conduct toward other residents, Alter's obstruction of justice, and Alter's role in causing Manhattan House to close.

Alter argues that he should be sentenced only for bribery, not extortion, because his relationship with Donald V. constituted a consensual *quid pro quo*. Alter further contends that certain sentencing enhancements and upward departures are not justified because, first, Alter was not a high-level government official; second, the Guidelines' definition of "victim" does not apply to this case; and third, Alter's conduct was not the proximate cause of Manhattan House's closure.

## BACKGROUND

In order to determine the facts relevant to sentencing, the Court held a five-day factual hearing pursuant to *United States v. Fatico*, 579 F.2d 707, 713 (2d Cir.1978), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980) [5].

### I. *Alter's Duties as Director of Manhattan House*

Harvey Alter was executive vice-president and director of Manhattan House from 1987 until its closing in January, 1989. Manhattan House was owned by a private corporation, Manhattan House CTC, Inc., which was under contract with the United States Bureau of Prisons. Alter and Michael Young were co-owners of Manhattan House CTC, Inc. PSR ¶ 25.

Manhattan House held approximately 100 halfway house residents ("residents") at any given time, and Alter was responsible for the overall care and custody of these residents. Alter's responsibilities included reviewing, accepting, and rejecting persons whom the Bureau of Prisons referred to Manhattan House for placement; securing jobs and job training opportunities outside the facility for selected residents;

4. The Pre–Sentence Report and both the Government's and Alter's legal briefs refer to the last names of some of the Manhattan House residents mentioned in the indictment by first letter only (*e.g.*, George "O."). Although these residents testified in open court and were the subject of media reports, in the absence of objection, we continue this practice here for all of the residents mentioned in the indictment.

5. In the Court's order dated September 25, 1991, the Court ordered an evidentiary hearing for sentencing purposes on the factual questions raised by the parties in their legal briefs dated August 22, 1991. These questions were: the cause, nature, and circumstances of the sexual relationship between the defendant and Donald V.; the cause, nature, and circumstances of any sexual relationship that may have existed between the defendant and other Manhattan House residents; the defendant's responsibilities at Manhattan House; and the effect, if any, of the defendant's unlawful conduct upon Manhattan House. Order Dated September 25, 1991 at 6.

The *Fatico* hearing was held, intermittently, between January 14 and January 22, 1992. "Tr." refers to the transcript of the *Fatico* hearing; "GX" refers to exhibits offered by the Government; "DX" refers to exhibits offered by the defense; and "PSR" refers to the presentence report prepared by the Department of Probation and revised on July 26, 1991.

approving overnight passes for selected residents; and otherwise helping to monitor or verify resident whereabouts. *Id.*

Alter also had the authority to review reports of rule violations by residents and to recommend to the community corrections manager of the Bureau of Prisons major sanctions to be imposed where appropriate. On his own authority, Alter could impose minor sanctions where appropriate without making a recommendation to the Bureau of Prisons [6].

During Alter's tenure as director of Manhattan House, Richard Luna was the community corrections manager of the Bureau of Prisons. Luna never declined to impose major sanctions that Alter recommended. Tr. 850–853.

## II. *Alter's Asserted Conduct Toward Donald V.*

Donald V., who is thirty-two years old, was a resident of Manhattan House during the summer of 1988. He arrived at Manhattan House from a federal prison in Allenwood, Pennsylvania ("Allenwood") on July 25, 1988. Donald V. left Manhattan House in September, 1988, when he was remanded to Allenwood as punishment for having taken drugs while at Manhattan House.

Donald V.'s criminal record, which consists of crimes committed from May, 1976 to September, 1990, is extensive. Over the past thirteen years, except for periods when he was incarcerated, Donald V. has been a heavy drug abuser, continuously involved in intravenous heroin and cocaine abuse and criminal activity. DX F, U; Tr. 36. Donald V. has at least twelve convictions to date. GX 1.

### A. Donald V.'s Relationship with Alter

The relationship between Alter and Donald V. began, for purposes of this case, on August 14, 1988. As punishment for Don-

ald V.'s having left the halfway house without permission the day before, Alter prohibited Donald V. from leaving the halfway house to appear at his job. As a result of his failure to appear at work, Donald V. lost his job. Tr. 47.

The sequence of events triggered by Donald V.'s losing his job was principally developed in the record of the hearing through the testimony of Donald V. What follows is a summary of the principal claims made by Donald V. on the witness stand.

On the evening of August 14, 1988, Alter entered Donald V.'s room while Donald V. was partially dressed and was having a conversation with some other residents. The conversation ended with Alter asking Donald V. to come to Alter's office, which was located around the corner from Donald V.'s room. In his office, Alter apologized to Donald V. for making him lose his job, after which Alter and Donald V. discussed, among other things, a proposed construction project for the roof of Manhattan House. Alter then asked Donald V. to join him on the roof to see the proposed construction sites. Tr. 49–51.

In the late evening of August 14, 1988, and in the early morning of August 15, 1988, on the roof of Manhattan House, Alter and Donald V. had a conversation that lasted for several hours. Among other things, Donald V. told Alter of his past problems with drugs, and Alter told Donald V. that he could allow halfway house residents to use drugs. Tr. 54–55.

In the early morning of August 15, 1988, Donald V. and Alter returned to Alter's office. Alter asked Donald V. to extend his arms, which he did as Alter watched. Alter then told Donald V. that he was "easy to look at." He then telephoned a hotel to reserve a hotel room for that day so that he and Donald V. could spend time

---

**6.** Major sanctions are imposed when a resident commits a serious violation of the halfway house's rules. Examples of major sanctions are returning a resident to prison, delaying parole, and revoking good time credits. Minor sanctions are imposed when a resident commits a minor violation of the halfway house's rules, such as violating curfew or not performing work details as instructed. Examples of minor sanctions are restricting a resident to the halfway house, instructing a resident to perform a work detail, cancelling a pass, and shortening the curfew hour. Tr. 852–853.

together. Alter wrote a note to the relevant halfway house staff members to sign Donald V. out of the halfway house. Tr. 59–61.

Donald V. did not wish or intend to leave Manhattan House to go with Alter to the hotel, but Donald V. did not openly refuse at the time because of his concern that he would "be getting on the wrong side of Alter" if he refused. Tr. 62. As Alter became occupied with other matters in the halfway house that morning, Donald V. returned to his room and went to sleep. Alter entered Donald V.'s room, woke him up, and told Donald V.'s roommate to make certain that Donald V. stayed awake because of an upcoming job interview. Tr. 63. Donald V. went back to sleep, but Alter came back to Donald V.'s room and again woke him up.

Donald V. avoided going to the hotel with Alter that morning by joining a group of residents who were partaking in a discussion. Donald V. did not report the incidents of that morning and the prior evening to anyone at Manhattan House. Tr. 68. He received no reprisals for avoiding Alter. Tr. 267.

During the weekend of August 19, Donald V. left Manhattan House on a weekend pass to visit his family at his parents' home. He told his parents some of the incidents that had occurred between Alter and himself. During the weekend, Donald V. also bought and used heroin and cocaine. Tr. 70–71; GX 10. He returned to the halfway house on August 21.

On August 23, 1988, a syringe was found in Donald V.'s room at the halfway house. He was required to submit a urine sample to the halfway house authorities for drug testing purposes, and he did so. Tr. 237–8.

About the same time that Donald V. was tested for drug abuse, Alter attempted to assist him in finding a new job. On August 24, 1988, Alter prepared a resume for Donald V., something Alter normally did not do for residents. Alter explained to Donald V. that he had written him a re-

sume because he was physically attracted to him, not because he had earlier caused him to lose his job. Tr. 90. Donald V. offered to paint Alter's office to repay Alter for preparing his resume, and Alter agreed. He then accompanied Donald V. to Martin Paints, a paint supply store, where the two bought painting supplies. Tr. 91.

While standing on the street after the purchase, Alter told Donald V. that he had been attracted to him since August 14, 1988, when he had entered Donald V.'s room and had seen him partially undressed. Alter then proposed that the two have oral sex in a hotel. Alter inquired whether Donald V. wanted him to provide Donald V. with drugs or money, and Donald V. agreed that he would accept money. Alter told Donald V. that he could use drugs in the halfway house, and Alter suggested ways in which Donald V. could foil halfway house drug detection tests that were sometimes performed. Tr. 92–94. After Alter told Donald V. that he wanted to have oral sex with him, Donald V. responded that he could not do so "straight." Alter then handed Donald V. a ten milligram valium tablet, which he ingested. Tr. 95–97.

The conversation outside Martin Paints lasted about an hour. Afterwards, Alter and Donald V. returned to Manhattan House briefly, and Alter signed Donald V. out of Manhattan House on the pretense that Donald V. would be at work for the evening. Alter gave Donald V. $20.00 to buy food and told him to wait at a nearby fast food restaurant, where subsequently Alter met him. Tr. 106.

Unable to obtain enough money at an automatic teller machine to pay for a hotel room, Alter and Donald V. took a taxi cab to Alter's apartment on 165 Christopher Street in New York City. Alter gave Donald V. another ten milligram valium tablet, which he presumably ingested. Tr. 106–107.

Upon entering the apartment, Alter and Donald V. went to the bedroom [7], where

---

7. At one point, although it is unclear when, Donald noticed a leather whip near Alter's closet. Tr. 122. However, there is nothing on the record that shows that Alter threatened to use the whip.

Alter placed on a table a prescription bottle that contained 4.7 or 5 milligram valium tablets. Alter told Donald V. to "help [him]self," and that he should not fear being caught at the halfway house for taking the drugs because the urine tests at Manhattan House did not detect valium. Alter then asked Donald V. whether he wanted a beer or soda. Alter retrieved a beverage can, presumably from the kitchen, and dropped what appeared to Donald V. to be a pill of some sort into the beverage. Donald V. took a small swallow of the contents of the can while ingesting some of the valium tablets. Tr. 114–115.

Alter then produced a bag of marijuana, rolled a joint of marijuana, and started to smoke it. Donald V. also smoked some marijuana despite Alter's warning to Donald V. that traces of the drug would remain in his body for a long time. Tr. 115, 131.

Alter then subjected Donald V., who was semi-conscious because of the drugs, to humiliating and painful acts of sadism, which included the tying up of Donald V.'s arms and genitals during the performance of oral sex. Donald V. described his physical condition while these acts were occurring as being "extremely high." Tr. 117–122.

Donald V. stayed at the Christopher Street Apartment overnight, longer than the pass that had been issued allowed. Alter called Manhattan House at 8:20 a.m. on August 25, 1988, and authorized Donald V.'s overnight absence from Manhattan House. GX 16. Alter used the pretense that Donald V. was at work. Tr. 124–125.

About 9:00 a.m. Alter and Donald V. left the apartment and went to a luncheonette for breakfast, where Alter gave Donald V. approximately two hundred dollars, and Donald V. left the restaurant. Donald V. then went to the Bronx and bought and used heroin and cocaine with the money that Alter had given him. Donald V. returned to Manhattan House that morning. Tr. 126–128. At some point, although it is unclear when, Donald V. began keeping private notes of his encounters with Alter. Tr. 325.

On the evening of August 26, 1988, Alter told Donald V. that he was going to include Donald V. in a group of residents whom Alter would have paint his offices. Alter told Donald V. that the actual purpose of his actions was to create work for Donald V. to perform so that Donald V. could earn a pass to leave Manhattan House. Alter explained that he wanted Donald V. to join him for the weekend at the Fire Island residence of the co-owner of Manhattan House, Michael Young. Tr. 135. In fact, Donald V., high from using drugs, slept during most of the time that the other residents were painting Alter's office despite Alter's urging that Donald V. join them for appearance's sake. Tr. 138.

Nevertheless, on August 27, 1988, Donald V. received a pass allowing him to leave Manhattan House. In order that Donald V. would not be called during the weekend by Manhattan House personnel, Alter suggested that Donald V. write on his pass that he was visiting a person in a new apartment that lacked a telephone. Tr. 138; GX 18.

After Donald V. received the weekend pass on August 27, 1988, he told Alter that he wanted to go to the Bronx to get some drugs. Alter signed Donald V. out of Manhattan House on the pretense that Donald V. was going to Martin Paints. GX 19. Donald V. bought heroin and cocaine in the Bronx and, after briefly returning to Manhattan House, went to a nearby restaurant to wait for Alter. Tr. 140–143. While awaiting transportation to Fire Island, Alter gave Donald V. a valium tablet, and Donald V. ingested it. Tr. 144.

Alter and Donald V. spent the afternoon and evening of August 27, 1988, and most of August 28, 1988, in the Fire Island vacation home of Michael Young. During the weekend, Alter encouraged Donald V. to take drugs and taunted him with pleasure as Donald V. injected himself with heroin. Before performing oral sex upon Donald V., Alter also struck Donald V.'s back with a whip for several minutes. Tr. 149–156.

Upon leaving Fire Island, Alter gave Donald V. approximately two hundred dollars. Donald V. went to the Bronx, where he bought more heroin and cocaine. Tr. 162–163.

After the weekend of August 25–27, 1988, Donald V. had no further sexual encounters with Alter. Subsequently, Donald V. began violating rules at Manhattan House, accumulating incident reports, and using drugs daily. Tr. 168.

On September 14, 1988, Donald V. was remanded to the Metropolitan Correction Center in New York City for sixty days because the urine test taken on August 23, 1988 disclosed his use of drugs. GX 33. On September 30, 1988 Donald V. went before a hearing at which Alter presided and pled guilty to the charges against him. The parties do not dispute that Alter's sentencing recommendation was a legitimate exercise of his authority. Tr. 173.

While awaiting the sentencing hearing, Donald V. had written a letter to Alter demanding that Alter pay him $8,550, the amount that Donald V. believed that he would have been able to send home from his earnings had he not lost his job on August 14. In the six-page letter, Donald V. refers to some of the ways in which Alter abused him, including the whipping. GX 35. Donald V. handed the letter to Alter after the sentencing hearing ended. Donald V. did not keep a copy of the letter for himself. Tr. 181–189, 248.

B. Donald V.'s Credibility With Respect to Alter's Purported Threats and Donald V.'s Purported Fear of Physical Harm

We first observe that Donald V. is a thirty-two year old, intelligent and streetwise multiple offender who was wholly unconvincing in the hearing in his designated role of vulnerable victim. The Court is distressed to note that, upon listening to and watching Donald V. testify, it appeared that he was reconstructing certain events to fit a contrived theory that Alter had explicitly threatened him with being remanded to prison if he did not have sex with him. Donald V. also testified that while travelling with Alter to Alter's Christopher Street home and Young's Fire Island residence, Donald V. feared that Alter might kill him when the two arrived at their destination. For reasons stated below, the Court finds this testimony to be not credible. The Court finds that Donald V.'s desire to abuse drugs without detection or penalty was the principal motive for his cooperation with Alter's sexual proposals, and that Donald V.'s drug abuse was not caused by Alter's sexual interest in him or overt actions toward him. We also find, however, that Donald V.'s drug abuse during the period of his sexual relationship with Alter was aided, abetted, and condoned by Alter.

As to Alter's initial proposition on the roof of Manhattan House, Donald V., in part prompted by leading questions, implied that Alter had both described his power over the halfway house and expressed frustration toward certain residents in order to intimidate Donald V. Donald V. also stated that on the street near the Martin Paints Store, Alter implied that he could make life at Manhattan House difficult and reminded Donald V. that his parents would be distraught were Donald V. sent back to jail. Based on Donald V.'s demeanor on the witness stand, the vagueness with which he addressed his encounters with Alter, and Donald V.'s own extensive history with drugs, which long predated his relationship with Alter, we reject this testimony.

Donald V.'s attempts to persuade the Court that on the way to and at Alter's apartment and Young's beach house, Donald V. feared that his life was in grave danger simply lack the ring of truth. Had Donald V. indeed feared death, it is inconceivable that he would not have complained of Alter's condut to prison authorities or simply submitted to the prospect of a brief return to Allenwood to conclude his sentence. Indeed he had already avoided going to a hotel with Alter on August 15, without apparent consequence. Furthermore, Donald V.'s testimony that he feared for his life contradicts his admission that he had not anticipated that he would be

subject to Alter's sadistic practices. Tr. 122. We find that his true fear lay in the imminent drug test result that would expose his abuse of drugs, which abuse predated both the apartment and the beach house sexual conduct.

Oddly, Donald V. admitted that he did not object to the Fire Island trip and testified that he assumed that the upcoming weekend would repeat the incidents that he had experienced at Alter's Christopher Street apartment. Tr. 136. These are strange sentiments for one assertedly contemplating with dread his mortal end.

Most tellingly, Donald V.'s personal notes and letter to Alter do not state that Alter made any threat to Donald V. or that Donald V. ever feared for his life. These documents suggest that Donald V. was tempted by Alter's offer of money and drugs, and that the sexual conduct was the means to obtain them.

The purpose of Donald V.'s letter was to demonstrate and frighten Alter with a command of detail that he had about their relationship. Donald V. states that Alter's offer of money and drugs on the sidewalk outside of the Martin Paints Store persuaded him to submit to Alter's demands for sex: "(CASH and Valium) You Blew my Mind!" wrote Donald V. (emphasis in original). There is no mention of any threat toward Donald V.[8] Ironically, Donald V. closes the letter by his insistence that he was not committing an extortion of Alter by sending the letter. We find that Donald V.'s sophistication on the nature of extortion was such that he would have been able to recognize conventional extortion had it been inflicted upon him.

Indeed, in his personal notes describing Alter's activity outside the Martin Paints Store, Donald V. wrote that Alter "propositioned" him, and that the two men "came to an agreement." DX C. The portions of Donald V.'s personal notes that were submitted to the Court lack any statement that Alter threatened him or that Donald V. feared that his life might be endangered during his encounters with Alter.

### C. Findings of Fact on Alter's Conduct Toward Donald V.

Notwithstanding belated and self-serving claims to the contrary, we find upon the entire record that Alter did not threaten Donald V. with physical harm or remand to prison during the course of their relationship. Rather, the two came to an agreement, albeit an unconventional one, on the roof of Manhattan House, and later, Alter offered to obtain drugs and help Donald V. escape detection for drug abuse in exchange for Donald V.'s having oral sex with Alter. By the time of Alter and Donald V.'s conversation on the street near Martin Paints, Donald V. had already taken drugs and knew that the laboratory results of his urine test would arrive at the halfway house in a few weeks. Donald V. was both fearful of being remanded to prison for drug abuse and intrigued by the opportunity to take drugs with impunity. Accordingly, he agreed to have oral sex with Alter, and he did so on two occasions. As promised, Alter gave Donald V. drugs and helped him obtain leave passes in order to purchase drugs. We therefore conclude that Alter and Donald V. entered into a cynical, mutually satisfactory, and wholly voluntary relationship of sex for drugs or access to drugs.

### III. *Asserted Obstruction of Justice by Alter*

On October 11, 1988 Donald V. was sent to Allenwood, where he stayed for three months. Tr. 264. A medical examination in Allenwood revealed whip marks on his back. Shortly afterwards, only in response to repeated inquiries from prison authorities, Donald V. told his story to agents of the Federal Bureau of Investigation.

On the morning of January 18, 1989, FBI agents interviewed Alter shortly before they conducted a search of Manhattan House. Alter stated to the FBI that he had never socialized with any resident, that he had never entertained any resident, that

---

**8.** At one point in the letter, Donald V. indicates that he feared Alter because Alter "had the key to [his] life," but Donald V. does not state that Alter threatened him in any way. GX 35.

no resident had ever been to his apartment at Christopher Street, that he had never invited a resident to a home outside of Manhattan House, and that he had never been present with any resident outside Manhattan House. GX 44.

The FBI agents showed Michael Young, then acting as Alter's attorney, two search warrants that directed searches of Manhattan House and Alter's residence at 165 Christopher Street. Young called Magistrate Judge Sharon Grubin in the Southern District of New York and requested a stay of the execution of the warrants so that he could proffer facts that would undercut the probable cause in the affidavit underlying the warrants. Magistrate Judge Grubin agreed to grant the stay. GX 44-45.

On the afternoon of January 18, 1989, the Government appealed the Magistrate Judge's stay before United States District Judge Charles E. Stewart, who was then serving as the emergency Part I judge for the Southern District of New York. In the argument before Judge Stewart, Alter stated that all of the relevant events in the case of Donald V. had already been fully disclosed to the Department of Justice and the Bureau of Prisons. However, Judge Stewart concluded that the basis for the search warrants was adequate and overruled the Magistrate Judge's stay. GX 45.

## IV. Asserted Disruption of Activities at Manhattan House

On January 30, 1989, *Newsday* published an article that discussed allegations that Alter had engaged in sexual activity with Manhattan House residents over the previous months.

On the same day, the United States Attorney for Southern District of New York wrote to David Essig, regional counsel to the Federal Bureau of Prisons to inform him of an ongoing investigation into the events at Manhattan House. The letter stated that F.B.I. agents had found drugs, drug related items, and evidence of sadomasochistic activities at Alter's apartment

in Greenwich Village and Michael Young's residence in Fire Island. Tr. 878; GX 80.

Early in the afternoon of the same day, officials from the Northeast regional office of the Bureau of Prisons decided to remove residents from Manhattan House and effectively close it down. Tr. 875-876 [9].

The residents departed from Manhattan House late in the afternoon of January 30, 1989. Out of the approximately 100 residents, approximately 40 went to Project Return, a nearby halfway house, and most of the rest were sent to their homes. Tr. 881-882.

## V. Asserted Improper Activity of Alter with Respect to Other Manhattan House Residents

The Court heard testimony from several former residents of Manhattan House as to conduct that was allegedly similar to Alter's conduct toward Donald V. The Court finds that in May, 1988, two months before Alter proposed sexual conduct to Donald V., Alter solicited two other residents to have sex with him in exchange for drugs, destroying urine samples, or overlooking disciplinary violations. In each case, the resident had violated halfway house rules or come close to doing so, Alter warned that he might sanction the resident, and, eventually, Alter solicited the resident to have sex.

### A. Alter's Conduct Toward Jose L.

Jose L. was a resident at Manhattan House from May 10, 1988 to July 18, 1988. GX 77-79. In 1983, he was arrested for attempted robbery of a bank, for which crime he received a five-year sentence upon his guilty plea. In 1991, he pled guilty to criminal possession of crack with intent to sell it. Tr. 760-763, GX 75. Jose L. is currently twenty-six years old.

On the first day of his stay at Manhattan House, Jose L. received a five-hour pass to leave Manhattan House under the pretense of needing to assist his sick father; in fact, Jose L. visited his girlfriend. He returned to Manhattan House when his pass expired.

---

9. During the month of January, Bureau of Prisons officials had considered alternatives to shut-

ting down Manhattan House, such as simply removing Alter.

Late that evening, according to Jose L., Alter called him to his office and told Jose L. that he knew that he had lied in order to receive a pass. Alter told Jose L. that he could easily send Jose L. back to jail, that he did not allow individuals with Jose L.'s criminal history in Manhattan House, and that the only reason that Jose L. was at Manhattan House was Alter's sexual attraction to his body. Jose L. also testified that Alter told him that Alter could get a job for him, give him money, enable him to take drugs through destroying his urine samples, and generally make life easy for him. Alter told Jose L. to remove his shirt, and Jose L. did so. Alter then performed oral sex upon Jose L. Afterwards, Alter went behind his desk and told him that he hoped that Jose L. would not reveal what had happened. Alter reminded Jose L. that he could send Jose L. back to prison, prevent Jose L. from leaving the halfway house, or make life easy for him at Manhattan House. Alter told Jose L. to consider consenting to having sex with him in the future. Alter and Jose L. had no further encounters of a sexual nature after that night. Tr. 775–788.

We have given considerable thought to the credibility of this witness. His previous statements about the incident to F.B.I. agents and the Grand Jury differ in numerous respects from his testimony at the hearing. He also stated that he had a deep seated desire to lie to F.B.I. agents about his interactions with Alter "in case there was not enough evidence to convict [Alter]...." Tr. 798. Nonetheless, we are satisfied that the core allegation he has made about the sexual incident in Alter's office is in substance true.

### B. Alter's Conduct Toward Gary O.

Gary O. was a resident of Manhattan House from April 7, 1988 to July 28, 1988. He entered Manhattan House to serve part of a sentence for possession of cocaine with intent to distribute. Other than this drug-related conviction, Gary O. has a record for contempt of a court order, and failing to appear in court. At the time that he testi-

fied at Alter's *Fatico* hearing, Gary O. was in violation of a court order for failing to appear with respect to petit larceny and related charges against him. Tr. 648–650, GX 66. Gary O. is currently forty-four years old.

A few days after Gary O. arrived at Manhattan House, he attempted to obtain a pass from Alter to leave the halfway house to attend his first day at a job to which he was to report. Alter refused, and, when Gary O. repeated his requests, Alter told Gary O. that he would have Gary O. remanded to prison if he did not stop bothering him. Gary O. did not attend his job that day.

Throughout the next few weeks, Alter repeatedly flattered Gary O. about his appearance. Approximately one month after arriving at Manhattan House, Alter directed Gary O. to clean his office late in the evening. After Gary O. cleaned some of the office, he returned to his room. Alter paged Gary O. through the halfway house communication system, but Gary O. did not respond. One of the halfway house employees then went to retrieve Gary O., and Gary O. returned to Alter's office. It was now well after midnight. Gary O. noticed that Alter was reading a letter from Gary O.'s file that had been written by Gary O.'s father.

After asking Gary O. questions about his relationship with his father and engaging Gary O. in conversation, Alter asked Gary O. to remove his clothes. Gary O. refused and told Alter that he was a heterosexual. Although Gary O. attempted to change the subject of conversation, Alter persisted in asking him to remove his clothes. However, Gary O.'s ability to continue to change the topic of conversation "wore [Alter] out." Gary O. returned to his room and went to sleep. Alter continued to flatter Gary O. in the weeks following that evening. Tr. 670–674, 719.

Although Gary O. has had severe psychological problems throughout most of his adult life, we found his testimony generally consistent, even-handed, and convincing [10].

---

**10.** The Court also heard testimony from two   other residents, Pedro R. and George O. The

## DISCUSSION

### I. *Alter's Base Offense Level and Chapter Three Adjustments*

#### A. Federal Sentencing Guideline § 2C1.1(c)(3)

■ The applicable Federal Sentencing Guideline[11] for the crime to which Alter pled guilty, official bribery, is Guideline § 2C1.1, which carries a base offense level of 10[12]. If a bribery-related offense involves "a threat of physical injury or property destruction," § 2C1.1(c)(3) states that a sentencing court must instead apply the offense level applicable to extortion, § 2B3.2[13]. § 2B3.2 carries a base offense level of 18.

The words "threat of physical injury or property destruction" in § 2C1.1(c)(3) appear to denote an expression that harm to one's person or property will be incurred by refusal to comply with a demand. An example of such a threat would be "your money or your life," since the speaker is threatening to kill the target if the target refused to surrender his money.

■ We believe that the Guidelines Commission intended the word "threat" to carry the conventional meaning of the word, as commonly used in extortion cases. The Government in essence argues that Alter's statements to Donald V. involved a "threat of physical injury" because the statements were pregnant with the eventuality of sadomasochistic practices. However, Alter never told Donald V. that he wanted to engage in sadomasochism with him. Moreover, we disagree with the Government that a prospect of harm unconnected to the target's refusal to cooperate is the same as a "threat" of harm in the conventional and obvious context of the Commission's use of the term.

■ The Government essentially argues that a conventional definition of the word "threat" is incorrect because it is contingent upon the target's refusal to comply. *See* Government's Pre–Hearing Memorandum of Law in Aid of Sentencing Dated August 22, 1991 ("Government Pre–Hearing Memo") at 7–8. This is irrelevant in light of our ruling that no explicit or implicit threat was made by Alter to induce the sexual conduct with Donald V. Moreover, the conventional definition of "threat" that we adopt focuses on the words or actions of the person making the threat, not on the target's actual behavior.

The Government in its pre-hearing papers did not contend that Alter made any express or implied "threats of physical harm or property destruction" within the meaning of § 2C1.1(c)(3), and, as we have said, the facts do not support that a threat of any kind was made[14]. Therefore, Alter's base offense level is 10, in accordance

---

Court does not recite findings as to these residents: The parties do not dispute that Alter did not attempt to have sexual relations with Pedro R., and we do not find credible that portion of George O.'s testimony that is relevant to the sentencing. Testimony was also offered by two former Manhattan House residents about Alter's alleged sexual conduct with another resident, Ernest T., who died in the facility from a drug overdose. Evidence on this matter was submitted in the form of F.B.I. interviews with Ernest T.'s relatives. Because this evidence is exclusively hearsay, we decline to credit it.

11. Sentencing determinations apply the version of the Guidelines in effect on the date of the sentence, unless an *ex post facto* problem would result. *United States v. Young*, 932 F.2d 1035, 1038 n. 3 (2d Cir.1991). Unless otherwise noted, we apply the Guidelines applicable in March, 1992.

12. The parties do not dispute that although a private contractor, Alter was a public official for the purposes of sentencing.

13. **§ 2C1. *Offering, Giving, Soliciting, or Receiving a Bribe Under Color of Official Right***

. . . . .

(c) Cross References
(3) If the offense involved a threat of physical injury or property destruction, apply § 2B3.2 (Extortion by Force or Threat of Injury or Serious Damage) if the resulting offense level is greater than that determined above.

14. We further find that the facts do not support the theory that Alter threatened to remand Donald V. to prison or impose sanctions upon Donald V. in exchange for sex. As we stated above, Donald V.'s testimony lacks any semblance of credibility on this point.

with Guideline § 2C1.1(a) [15].

### B. Federal Sentencing Guideline § 2C1.1(b): Alter's Status as an "Official Holding a High Level Decision Making or Sensitive Position"

■ The Government requests that we apply an enhancement based on the specific offense characteristic set forth in Guideline § 2C1.1(b)(2)(B), which states, "If the offense involved a bribe for the purpose of influencing ... any official holding a high level decision-making or sensitive position, increase by 8 levels." (emphasis in original).

This offense level characteristic does not apply to the facts in this case. Alter's position as director of a halfway house placed him at a low level in the Bureau of Prisons hierarchy. The Bureau of Prisons' 1990 Facilities Booklet reveals that Alter's superior, the Bureau of Prisons Community Programs Manager, was eleven levels removed in the bureaucratic "chain of command" from the highest position of director of Bureau of Prisons. *See* Letter to Court of Messrs. Goldman, Eisenmann, and Young Dated August 22, 1991 ("Defense Pre–Hearing Memo") at 20. Alter lacked the legal authority to impose major disciplinary sanctions without referring the discipline cases to his superiors. Although Alter possessed a sensitive position, some degree of discretion, and *de facto* authority, these characteristics do not render one a "high-level" government official. *See U.S. v. Stephenson*, 895 F.2d 867, 877–878 (2d Cir.1990). Accordingly, we find § 2C1.1(b)(2) inapplicable.

### C. Federal Sentencing Guideline §§ 3A1.1 and 3A1.3: Donald V.'s Status as a "Victim"

■ The Government requests that we enhance the sentence by the adjustments set forth in Guideline §§ 3A1.1 and 3A1.3. Guideline § 3A1.1 carries a two-level upward adjustment for a crime in which the victim was especially vulnerable [16], and § 3A1.3 carries a two-level adjustment for crimes in which the victim was physically restrained during the course of the offense [17].

■ However, the use of the term "victim" in the above two Chapter Three adjustments does not appear to apply to a conviction under 18 U.S.C. § 201, in which the United States Government, not the person who offers the Government official the bribe, is properly termed the "victim." *See* 1962 U.S.Code Cong. & Admin.News at 3852, 3853 (defining objective of § 201 as "[t]he necessity for maintaining high ethical standards of behavior in the Government"); *United States v. Jacobs*, 431 F.2d 754, 759 (2d Cir.1970), *cert. denied*, 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120 (1971) (defining objective of 18 U.S.C. § 201 as the deterrence of official corruption). A person who bribes a federal official is simply not conventionally deemed a "victim" of official bribery. Thus, we find that the Guidelines' "vulnerable victim" and "victim restraint" adjustments do not apply because Donald V. is not a "victim" within the meaning of these sections [18]. *Cf. U.S. Velasquez–Mercado*, 872 F.2d 632 (5th Cir.), *cert. denied*, 493 U.S. 866, 110 S.Ct. 187, 107 L.Ed.2d 142 (1989) (sexually

---

15. We need not make a finding for the purposes of § 2B3.2 that the sadomasochistic conduct in which Alter and Donald V. engaged caused actual physical harm, because Alter's behavior did not meet the threshold requirement of containing a *threat of physical harm* within the meaning of § 2C1.1(c)(3). (emphasis added).

16. **§ 3A1.1.  *Vulnerable Victim***
    If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels. (emphasis in original).

17. **§ 3A1.3  *Restraint of Victim***
    If a victim was physically restrained in the course of the offense, increase by 2 levels. (emphasis in original).

18. The 1988 Guidelines, which govern this case in the presence of an *ex post facto* problem, state that the Chapter Three Victim Related Adjustments are "to be treated as specific offense characteristics." *See Introductory Commentary,* Chapter Three, Part A (1988 Guidelines). Such treatment renders application of these enhancements to the offense of official bribery particularly inappropriate.

abused female illegal aliens were not "victims" to crime of conviction, the transportation of illegal aliens; accordingly, § 3A1.1 does not apply).

### D. Federal Sentencing Guideline § 3C1.1: Alter's Obstruction of Justice

■ We find that Alter "willfully ... attempted to obstruct ... the administration of justice" on January 18, 1989 when he argued to Judge Stewart that the search warrant of Manhattan House should be stayed because Alter purportedly had already disclosed all of the occurrences relevant to Donald V.'s complaint. *See* Application Note 3(f) to Guideline § 3C1.1 (includes "providing materially false information to a judge or magistrate" as an example of obstruction requiring a two-level enhancement); *United States v. Pando*, 955 F.2d 49 (table), 1992 WL 26802, * 4, 1992 U.S.App. LEXIS 3319, * *3–4 (10th Cir. 1992). In fact, Alter had not yet told the authorities of his conduct with respect to Donald V. Accordingly, we find § 3C1.1 applicable and enhance Alter's sentence by the requisite two levels [19].

### E. Acceptance of Responsibility

■ We agree with the Pre–Sentence Report's findings that Alter's plea and accompanying statements of regret entitle him to a two-level reduction in offense levels pursuant to § 3E1.1. This reduction thus offsets the two-level enhancement for Alter's obstruction of justice.

### F. Findings Under the Guidelines

Under the applicable Guidelines, this Court makes the following findings with respect to Alter: a total offense level of ten; a criminal history that places him in category I; a Guidelines imprisonment range of six to twelve months; a fine range of from $2,000 to $20,000; a term of supervised release of two to three years; and a mandatory special assessment of $50.

### II. *Upward Departures*

■ Under the applicable version of 18 U.S.C. § 3553(b), the Court may impose a sentence outside the range established by the applicable guideline, if the Court finds "that an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines."

The Court finds that aggravating circumstances exist in this case that require a significant upward departure. Our survey of the case law under the Guidelines has not disclosed any official bribery case with facts remotely similar to this case. First, although, as we have found, Alter's conduct did not involve the threat of physical or property harm in the sense of conventional extortion, Alter's conduct did occur in a setting of a unique warder/inmate relationship, in which Alter tried to and did exploit halfway house residents Donald V., Jose L., and Gary O. in a deeply disturbing manner, in that the custodial character of the institution was used to further Alter's sexual interests. Second, Alter's acts, even with respect to Donald V. alone, had a widely destructive impact upon not only Manhattan House but also the entire federal prison system. Third, Alter's bribe *quid pro quo* with Donald V. consisted of encouraging the abuse of drugs by a chronic drug abuser, thus materially altering the conventional bribery scenario had in mind by the U.S. Sentencing Commission in formulating the relevant guideline.

### A. Abuse of the Warder/Inmate Relationship

The guideline for bribery does not accurately gauge Alter's conduct because Alter's sexual solicitations of the various residents went well beyond the threshold of merely asking for a bribe, to become an emotional and psychological invasion of the residents' personal space, privacy, and identity. Taking advantage of the singularly

---

**19.** We recognize that the Application Note 4(b) to Guideline § 3C1.1 states that "making a false statement, not under oath, to law enforcement officers" is not grounds for an enhancement if it did not significantly impede the investigation of the offense. Therefore, we do not base the two-point enhancement on Alter's misleading statements to the F.B.I. officers.

restrictive environment of a correctional institution, Alter was able to and did manipulate the residents in several ways conducive to furthering his sexual desires. He implicitly relied upon or explicitly used the controls, procedures, and rules of the halfway house for these purposes in an entirely unique conflict of interest. Accordingly, although Alter did not make explicit threats to the inmates, Alter's perversion of the warder/inmate relationship at Manhattan House calls for an upward departure that adequately reflects this unique form of functional exploitation [20].

The conduct in which Alter engaged must be understood in the environment in which it took place. The residents were subject to an autocratic, disciplined, 'round-the-clock regimen. This level of scrutiny and power is entirely absent in most bribe-giver and bribe-taker environments. Such an atmosphere destroys certain barriers between residents and staff can create unusual incentives for each.

### 1. Alter's Improper Intrusions into the Residents' Lives

#### a. Physical Access to Residents and Access to Knowledge

Alter had unlimited physical access to the residents. As the primary supervisor of the halfway house, Alter could physically intrude at will at all hours upon the personal lives of its residents. Moreover, Alter had untrammelled access to the personal files of the residents, and the most personal, sensitive, and intimate medical, psychological, and family information found there. Alter's position further allowed him to mediate between the world of the halfway house and the "outside," a

most imposing power. Lastly, Alter possessed information about the workings of the halfway house that could be valuable to a resident willing to compromise himself.

#### b. Harassment of the Residents

Alter harassed Donald V., Gary O., and Jose L. through his constant access to them, his ability to control their movements, and his knowledge of their personal weaknesses.

We find that on August 14, 1988, Alter entered Donald V.'s room and saw Donald V. semi-clothed. Alter called Donald V. out to his office, and Donald V. had no choice but to join him. Alter's conversation with Donald V. on the rooftop lasted into the early hours of the morning. Alter then prevented Donald V. from going to sleep by constantly waking Donald V. In the weeks ahead, Alter continued this harassment by exercising his authority to take Donald V. out of the halfway house where he could speak to him without inhibition.

We further find that Alter also exploited Donald V.'s drug dependence; the two talked of Donald V.'s history of drug abuse on the roof of Manhattan House. On the corner of Martin Paints, Alter supplied Donald V. with valium and told Donald V. ways in which he could avoid a negative drug-test result. Alter encouraged Donald V. to shoot heroin at Young's Fire Island home. We infer that Alter knew that Donald V. was depending upon him to prevent negative drug tests from being revealed.

We also conclude that throughout Alter and Donald V.'s relationship, Alter seduced Donald V. with the promise of a new job and offers of money. Donald V. had re-

---

**20.** We make this departure under Guidelines' § 5K2.0. Under the 1988 version of the Guidelines, § 5K2.0 states that sentencing courts should apply § 1B1.3 to departures based on "harms" incurred as a result of a defendant's misconduct. Alter in essence argues that § 1B1.3(a)(2) only allows consideration of the circumstances involved in a course of conduct related to the charge of conviction where § 3D1.2(d) would require grouping of multiple counts. As Alter points out, the 1988 Guidelines' § 3D1.2(d) did not require grouping of multiple counts of official bribery. Defense Pre–Hearing Memo at 11. However, because

§ 5K2.0 makes § 1B1.3 applicable only to "harms" and not to conduct, we may consider Alter's course of conduct and circumstances involved in his treatment of other residents as such conduct and circumstances relate to the offense of conviction. Such a consideration derives from a clear reading of § 5K2.0 and is in accord with *United States v. Kim,* 896 F.2d 678, 684 (2d Cir.1990).

Application of the Guidelines' version current as of March, 1992 would not yield a different result because the current version of the Guidelines' § 5K2.0 does not require reference to § 1B1.3 at all.

cently lost a job and Alter, as a director of the halfway house, would be sensitive to Donald V.'s lack of funds. Simply put, Alter shamelessly exploited Donald V.'s weaknesses.

With respect to Gary O., we find that Alter harassed him by forcing him to work late at night and waking him up when Gary O. tried to avoid him. Alter also tried to demonstrate to Gary O. that, because he could probe into Gary O.'s personal relationship with his father, he wielded power over Gary O. After unsuccessfully soliciting Gary O., Alter's verbal harassment of Gary O. continued for several weeks.

Lastly, Alter's effective control over Jose L.'s movements enabled Alter to speak to him without interruption and without concern that Jose L. would leave Alter's office. Alter's control over Jose L. directly facilitated the sex that Alter sought.

### 2. *Alter's Abuse of his Position of Disciplinary Authority*

#### a. The Consequences of Violating Halfway House Rules

Life in a halfway house carries privileges beyond those enjoyed in prison, and the prospect of losing those privileges can exert strong pressure upon a halfway house resident to accommodate the interests of his warder. A prisoner is transferred to a halfway house four to six months before the end of his sentence so that he may begin the necessary adjustment to freedom. During this period, he may work at a paying job and visit family on certain weekends.

A major violation of halfway house rules can result in being remanded to prison. A report of such a violation can thus revoke entirely the freedoms that a resident enjoyed in Manhattan House. A minor violation might cause a resident to miss work or the opportunity to visit his family. For one who recently lacked such privileges, the expectation that they will be revoked may make a halfway house resident particularly vulnerable to being preyed upon by unscrupulous halfway house officials.

#### b. Alter's Abuse of his Ability to Discipline or Remand the Residents

We find that Alter's encounters with Jose L. and Gary O. were not consensual. We credit the testimony of both that they did not desire to have sex with Alter and were not sexually attracted to him. We also find that Donald V. had no sexual interest in Alter but agreed to the sexual conduct at the Christopher Street apartment and the Fire Island beach house to avoid remand to prison for his abuse of drugs and further his drug abuse.

Despite their different motivations and reactions as to cooperation with Alter, these three residents shared a common predicament that Alter attempted to and did exploit. As a halfway house resident, each was vulnerable to being remanded to prison or disciplined. Indeed, the facts of this case bear out this unique vulnerability. Each resident had previously misbehaved so as to risk possible discipline: Donald V. had taken drugs with and without Alter's cooperation; Jose L. had falsified a leave pass; and Gary O. had disregarded Alter's instructions. Alter knew of the residents' vulnerability to being disciplined or remanded. Nevertheless, Alter abused his superior position over the residents by soliciting and, in two cases, receiving their sexual favors, or by harassing them as described above.

\* \* \* \* \* \*

In summary, Alter's predatory behavior, which facilitated his bribery agreement with Donald V. and was present in his conduct towards the other two residents, was rooted in the nature of the warder/inmate relationship and as such puts the crime in a context far more egregious than the conventional bribery case. These unique, aggravating facts are of a kind not adequately considered in the Guidelines.

#### B. Alter's Disruption of Manhattan House and the Federal Corrections System

The Court further departs from the Guidelines because it cannot otherwise adequately take account of the destruction that Alter's conduct inflicted upon Manhat-

tan House and the Federal Corrections system [21]. Just as Alter's offense cannot be understood without reference to its roots in the warder/inmate relationship, Alter's conduct also must be understood in light of his trust and his official responsibilities [22].

### 1. The Trust Held by a Halfway House Director

When a halfway house director is corrupt, he or she can often carry out wrongdoing without inhibition. Because a halfway house is removed from the public eye and has a "clientele" that lacks an effective voice, a halfway house director possesses a type of latitude not normally held by other public officials. Indeed, the trust placed in the hands of a halfway house director is similar to that held by a military officer. A judge reaffirms this trust every time he or she places the lives of those sentenced into the hands of the director of the halfway house, and the public expects such an official to protect and do no harm to those in his or her charge. In practical effect, however, such an official is the law of the realm within the walls of his facility.

Furthermore, it can be inferred that conduct of the type exposed in this case is often sheltered from the public view, but is well-known to those who reside in a halfway house. While kept hidden from the outside world, such wrongdoing acts as a virus that poisons an institution from within.

But once the wrongdoing becomes public, as in this case, what may have appeared banal to those grown cynical inside the institution, rightfully appears bizarre and shocking to the outside world. The result is the collapse of public trust in the institution.

### 2. The Rehabilitative Mission of a Halfway House

Halfway houses serve largely to give prisoners' self-reliance and self-esteem so as to prepare them to return to society. The much-debated "rehabilitative" function of prisons is most evident, and most visible, at a halfway house. A resident may work part-time at a job in the outside world, and he may also spend designated leave time away from the halfway house. These freedoms help a prisoner gain skills and confidence necessary to function as a responsible and productive citizen. A conventional bribe solicitation negatively affects the person solicited merely by drawing him into illegal activity; the bribe negatively affects the public by weakening a government function. But when halfway house employees solicit residents to partake in illegal activity, such as drug abuse, they are degrading a person whose progress is at an especially sensitive stage. When such a solicitation involves unwanted sex, the degradation is profound indeed.

Furthermore, illegal conduct by a halfway house employee toward a resident is by definition targeted at a person who has been found likely to commit criminal activity. The public is thus jeopardized by the possibility of that person's recidivism. Such corruption also mocks the investment of taxpayer dollars that are supposed to facilitate his rehabilitation.

---

21. The unusual circumstances of this case justify departure under § 5K2.7:

§ **5K2.7 Disruption of Governmental Function (Policy Statement)**
If the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected. Departure from the guidelines ordinarily would not be justified when the offense of conviction is an offense such as bribery or obstruction of justice; in such cases interference with a governmental function is inherent in the offense, and *unless the circumstances are unusual* the guidelines will reflect the appropriate punishment for such interference. (emphasis added).

22. In departing under § 5K2.7, we consider the harm to the Bureau of Prisons that resulted from Alter's relationship with Donald V. and not harm that may have resulted from Alter's relationship with the other prisoners. *See* note 20, *supra.* However, Donald V.'s relationship with Alter was by far the most involved and sordid of all of the relationships that Alter had with residents. Moreover, it was Donald V.'s relationship with Alter that directly resulted in making public Alter's conduct. Therefore, the Court concludes that very substantial harm to the Bureau of Prisons resulted from Alter's conduct with Donald V.

### 3. The Consequences of Alter's Behavior

Alter's behavior had far-ranging negative consequences that should have been clearly foreseeable to Alter in light of the nature of his relationship with Donald V. The sordid and corrupt nature of the events with respect to Donald V. alone must have inevitably caused a loss of confidence in the private halfway house system on the part of sentencing judges and the public at large. The extent to which this method of rehabilitation is now reconsidered or bypassed altogether because of Alter's conduct cannot be known, but it cannot be marginal.

Manhattan House itself shut down after Alter's conduct became public. Some residents were moved to other facilities, others were released prematurely, and the months of progress that residents had achieved with personnel whom they came to know and trust were imperiled. Moreover, as a result of the shutdown of Manhattan House, these other facilities had to carry the burden of a heavier volume of residents, and, hence, were diminished in effectiveness.

Based upon the record, we conclude that during the time that Alter's relationship with Donald V. took place, both halfway house personnel and residents were aware of Alter's behavior. It would have been strange indeed had Alter's phone call on behalf of Donald V. on the morning after their first encounter not raised questions in the halfway house. The same is true for Donald V.'s passes to leave the halfway house that Donald V. "earned" while high on drugs. Thus, we further conclude that Alter's behavior negatively affected the morale of halfway house staff and residents when it occurred.

### C. Alter's Providing Donald V. with Drugs, Money for Drugs, and the Opportunity to Obtain Drugs

Lastly, we find Alter's "bribe" arrangement with Donald V. to be particularly egregious and idiosyncratic because the bribe *quid pro quo* consisted of providing Donald V. with drugs, financial means to acquire drugs, and the bending of the halfway house rules to allow Donald V. access to drugs, an independent violation of federal law [23].

This case differs markedly from the typical bribery scenario. Here, we fully credit Donald V.'s testimony that Alter provided him with drugs and money to purchase drugs [24]. In this case, as we have found, Alter affirmatively aggravated Donald V.'s drug abuse problem when his duty required him to mitigate it. As such, he did not confer an advantage upon Donald V., but inflicted a grievous injury, and thus implicated in the bribe a unique betrayal of the trust that had been conferred upon him by the Justice Department and the Bureau of Prisons.

\* \* \* \* \* \*

In light of the foregoing, the Court concludes that a substantial upward departure is warranted and required.

Sentence will be imposed on April 6, 1992 at 3:15 p.m. in Courtroom 312, after the Court has heard the parties on the appropriate degree of upward departure in light of our findings.

SO ORDERED.

---

**23.** The departure on these grounds falls under § 5K2.0.

**24.** Donald V.'s testimony is supported by an F.B.I. search of Alter's Christopher Street Apartment that uncovered, among other things, four pill containers that were used to hold valium tablets. The search of Alter's apartment also revealed 228.9 grams of marijuana. GX 14, 15.